UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
~~EASTERN~~ DIVISION
Central

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 1 4 2020

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

RICHARD HALL )
)
Plaintiff, )
)
)
v. )
)
MICROPORT ORTHOPEDICS, INC. )
)
Defendant. )
)
)
)

Civil Action No. 4:20-CV-50-KGB

This case assigned to District Judge Baker
and to Magistrate Judge Kearney

## COMPLAINT FOR DAMAGES

Plaintiff, Richard Hall, files this Complaint for Damages against Defendant Microport Orthopedics, Inc. ("Microport" or "Defendant"), a Delaware corporation whose principal place of business is in Arlington, Tennessee, respectively showing the Court the following:

## NATURE OF ACTION

1.      This is a Complaint for Damages associated with metal wear debris, corrosion and resultant metal ions from a failed metal-on-metal hip implant.

2.      For many years, Defendant has known its hip replacement device –the "Profemur TL", "Profemur" or the "Device" was prone to fretting and corrosion and had a propensity to fail within a few years of implantation despite that hip implant devices typically last up to twenty years or more.  The articulating pieces (femoral ball and cup) of Defendant's Device are comprised of a Cobalt and Chromium ("CoCr") alloy.   As designed, the Device's metal-on-polyethylene components generate metal debris, corrosion and metal ions, which cause dangerously elevated blood levels of CoCr ions, adverse tissue reactions, pseudo tumors, necrosis, bone loss and other adverse medical events in patients.  As a result of the Device's defects and Defendant's tortious

acts/omissions, Plaintiff Richard Hall, and many other patients who received the Device, endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent surgery to replace the defective Device, giving rise to more pain and suffering, a prolonged recovery time, and an increased risk of complications and death from surgery.

## PARTIES

3.      At all relevant times hereto, Plaintiff Richard Hall was a resident and citizen of the State of Arkansas, residing in Searcy, White County, Arkansas.

4.      Defendant is a Delaware corporation, with its principal place of business at 5677 Airline Road, Arlington, Tennessee 38002-9501 and is registered to do business in the State of Tennessee, and at all times relevant hereto did business in the State of Tennessee and in the State of Arkansas.  Defendant may be served with process by serving its registered agent for service, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

5.      Defendant was, at all relevant times, engaged in the business of designing, developing, manufacturing, distributing, selling, marketing and/or introducing into interest commerce, either directly or indirectly through third parties or related entities, various prosthetic orthopedic products, including the Profemur TL at issue in this civil action.

## STATEMENT OF JURISDICTION AND VENUE

6.      At all times relevant hereto, Microport advertised, promoted, marketed, sold and/or distributed the defective Profemur TL, including the Profemur TL femoral head and Profemur TL acetabular cup, throughout the United States generally, and in Arkansas in particular.

7.      The amount in controversy exceeds $75,000.00 exclusive of interest and costs. Accordingly, this Court has jurisdiction based upon complete diversity of citizenship pursuant to 28 U.S.C. §1332.  Furthermore, venue is proper in that the Plaintiff resides in the district and the implant of the medical hardware and its replacement occurred in this district.

## FACTUAL ALLEGATIONS

8.      On January 12, 2016, Dr. Thomas Day implanted a Microport Profemur TL system in Plaintiff, including the following components:   Polyliner ID Size 40mm Group F, Ref: DLXPGF40, Lot: 1638225, Exp: 2023-12-31; PC Shell Size 58mm, Group F, Ref: DSPCGF56, Lot: 1628387, Exp: 2023-10-31; Femoral Stem, size 4, 116mm, Ref: PRTL-0024, Lot: 1612607, Exp. 2023-08-31; Femoral Head, size 40mm, Ref: 38AC4000, Lot: 1612607, Exp. 2023-07; Neck Sleeve, size Medium, Ref: 38NS0000, Lot: 1634564, Exp. 2023-11-30; Modular Neck short, 8 deg., Ref: PHAC1252, Lot: 1617436, Exp. 2023-09-30.

9.      On July 19, 2018, Plaintiff had a revision of his right hip due to increasing pain and elevated metal ions.

10.     In the July 19, 2018 revision surgery, Plaintiff's surgeon, Dr. C. Lowry Barnes found pseudo tumors requiring debridement and hardware corrosion necessitating removal of all of the artificial hip components.

11.     Plaintiff's Profemur TL had failed due to metallosis, i.e., acute onset of pain, soft tissue inflammation, tissue necrosis, etc.

12.     Since Plaintiff's right hip revision surgery, Plaintiff is still restricted in activities and has physical limitations.

13.     Presently, Dr. Barnes is aware of risks associated with the MOM hip implant such as adverse reaction, metal ions, metallosis, necrotic tissues and states in the op note that "the implant does have known problems from my practice."

14.     Microport marketed that the Device experienced acceptably low failure rates, despite real revision rates reported via medical device registries and surgeons' actual revisions demonstrating that the Profemur TL Device had a statistically unacceptably high failure rate.

15.     Microport did not report the Profemur TL Devices' high failure rates to surgeons, to patients with implanted Profemur TL's, or to the public.

## PLAINTIFF'S INJURIES AND DAMAGES

16.     On or about January 12, 2016, Plaintiff Richard Hall had a Microport Profemur TL artificial hip implanted in his right hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

17.     Orthopedic surgeon Thomas Day, M.D. ("Dr. Day") performed the Index Surgery during which he implanted the Profemur TL in Plaintiff Richard Hall.

18.     Plaintiff Richard Hall's Index Surgery was performed at Unity Health – White County Medical Center located at 3214 East Race Street, Searcy, White County, Arkansas.

19.     Dr. Day did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff Richard Hall or negligently cause any injury to Plaintiff in any of the following respects:

(a)     in the care or treatment that he provided to Plaintiff Richard Hall prior to beginning the hip implant surgery;

(b)     in the hip implant surgery he performed on Plaintiff Richard Hall; or

(c)     in the care or treatment that he provided to Plaintiff Richard Hall, subsequent to Plaintiff Richard Hall's hip implant surgery.

20.     Based upon the patient population that Microport intended its artificial hip devices to be implanted in, at the time of Plaintiff Richard Hall's Index Surgery, he was an appropriate patient to be implanted with the Profemur TL.

21.     Dr. Day recommended the Profemur TL to Plaintiff Richard Hall and indicated that the Device was appropriate for him.

4

22.     Plaintiff Richard Hall reasonably relied upon Dr. Day in deciding to proceed with hip replacement surgery and have the Profemur TL implanted.

23.     Before or during the course of Plaintiff Richard Hall's Index Surgery, Defendant arranged for the Profemur TL that was implanted in Plaintiff Richard Hall to be delivered to Unity Health – White County Medical Center and/or Dr. Day for implantation in Plaintiff Richard Hall.

24.     Defendant, directly or through its subsidiaries or affiliates, designed, manufactured, distributed and sold in the United States various prosthetic orthopedic devices, including the Profemur TL implanted in Plaintiff Richard Hall during the Index Surgery which included the following components:

Polyliner ID
Size 40mm
Group F
Ref: DLXPGF40
Lot: 1638225
Exp: 2023-12-31;

PC Shell
Size 58mm
Group F
Ref: DSPCGF56
Lot: 1628387
Exp: 2023-10-31;

Femoral Stem
Size 4, 116mm
Ref: PRTL-0024
Lot: 1612607
Exp. 2023-08-31;

Femoral Head
Size 40mm
Ref: 38AC4000
Lot: 1612607
Exp. 2023-07;

Neck Sleeve
Size Medium

Ref: 38NS0000
Lot: 1634564
Exp. 2023-11-30;

Modular Neck
Short, 8 deg.
Ref: PHAC1252
Lot: 1617436Exp. 2023-09-30.

These components are hereinafter collectively referred to as the "Profemur TL" or the "Device".

25.     At the Index Surgery, each of the components of Plaintiff Richard Hall's Profemur TL Total Hip System was in substantially the same condition in all relevant respects as when they left Defendant's control.

26.     At all times relevant hereto, Plaintiff Richard Hall used the Profemur TL implanted during the Index Surgery in a normal and reasonably foreseeable manner.

27.     On or about July 19, 2018, Plaintiff Richard Hall reported to Dr. Barnes for revision surgery of his failed hip prosthesis ("Revision Surgery").  Dr. Barnes recommended the Revision Surgery after Plaintiff Richard Hall presented with pain and elevated metal ions.

28.     Plaintiff Richard Hall's Revision Surgery was necessary because the Device failed due to adverse tissue reaction to metal debris, corrosion and resultant metal ions.

29.     The Revision Surgery was performed by Dr. Barnes at UAMS in Little Rock, Arkansas.  During the Revision Surgery, Dr. Barnes removed failed components of Plaintiff Richard Hall's Profemur TL.

30.     But for the fact that the Profemur TL had generated metal debris, metal ion and corroded causing it to fail and injure Plaintiff, Plaintiff Richard Hall's Device was not otherwise in need of revision.

31.     On or about July 19, 2018, it was discovered that the Device failed due to metal debris, corrosion and resultant metal ions, due to the metal-on-polyethylene design between the articulating surfaces, causing continuing and otherwise irreversible physical injury to Plaintiff Richard Hall.

32.     On or about July 19, 2018, the Profemur TL implanted in Plaintiff Richard Hall's right hip was discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendant, as alleged in this Complaint.

33.     The Profemur TL (and its components), to include the Device implanted in Plaintiff Richard Hall was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

(a)     it was and is unreasonably dangerous under Arkansas product liability law as a result of one or more or a combination of the following:

(i)     the Profemur TL Total Hip Implant System was manufactured/designed in such a manner as to general CoCr metal debris, corrosion and resultant CoCr metal ions, thereby increasing the potential for failure;

(ii)    the components were manufactured/designed in such a way as to make the articulating surfaces of the components susceptible to fretting and corrosion, thereby increasing the potential for failure; and

(iii)   there may be other conditions or defects yet to be determined.

(b)     it was dangerous to an extent beyond which could be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(i)     the ordinary consumer would not contemplate that the Device would create metal debris, metal ions and corrosion or that premature revision surgery would become necessary 2 years, 6 months, after implantation; and

(ii)    the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the Device releasing harmful metal ions and metal debris in the consumer's body that caused adverse tissue reactions and other medical complications.

34.    The Device was not tested in design and development under the normal in vivo patient environmental conditions that were known would be encountered during normal use of the Device.

35.    Microport knew the Device was failing at higher than expected rates from fretting and corrosion of the articulating surface prior to the date of its implantation in Plaintiff Richard Hall's Index Surgery.

36.    Microport knew the Device was failing at higher than expected rates due to fretting and corrosion prior to the date of Plaintiff Richard Hall's Revision Surgery, during which it was discovered that Plaintiff suffered from adverse tissue reaction to metal debris, metal ions and corrosion.

37.    Prior to the Index Surgery, Microport did not warn patients, surgeons, customers, or its sale representatives/distributors that the Device was known to be failing from metal debris and corrosion at higher than expected rates.

38.    On or about July 19, 2018, Plaintiff Richard Hall discovered the Device implanted in his right hip failed due to adverse tissue reaction from metal debris, metal ions and corrosion as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

39.     As a directed and proximate result of the failure of the Profemur TL, Plaintiff Richard Hall has sustained injuries and damages, including but not limited to:

      (a)     undergoing surgery to remove and replace the failed prosthesis;

      (b)     past and future pain and anguish, both in mind and in body;

      (c)     permanent diminishment of her ability to participate in and enjoy the affairs of life;

      (d)     medical bills associated with revision surgery and recovery therefrom;

      (e)     future medical expenses;

      (f)     loss of enjoyment of life;

      (g)     loss of past and future earnings and earning capacity;

      (h)     disfigurement; and,

      (i)     physical impairment.

40.     Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  21 U.S.C. §351.

41.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  21 U.S.C.§352.

42.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prevent introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports

if any medical device may have caused or contributed to death or serious injury, or if the device

has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law

also mandates that the FDA establish regulations requiring a manufacturer of a medical device to

report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health

posed by the device, or to remedy a violation of federal law by which a device may present a risk

to health.  21 U.S.C. §360(i).

43.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe

regulations, requiring that the methods used in, and the facilities and controls used for, the

manufacture, pre-production design validation (including a process to assess the performance of a

device, but not including an evaluation of the safety or effectiveness of a device), packaging,

storage and installation of a device conform to current good manufacturing practice, as prescribed

in such regulations, to assure that the device will be safe and effective and otherwise in compliance

with federal law.

44.     The regulations requiring conformance to good manufacturing practices are set

forth in 21 C.F.R. §820, *et seq.*  As explained in the Federal Register, because the Current Good

Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the

regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the

quality system regulations provide a framework of basic requirements for each manufacturer to

use in establishing a quality system appropriate to the devices design and manufacture and the

manufacturing processes employed.  Manufacturers must adopt current and effective methods and

procedures for each device they design and manufacture to comply with and implement the basic

requirements set forth in the quality system regulations.

45.     Pursuant to 21 C.F.R.§820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act").  21 U.S.C. §351.

46.     Pursuant to 21 C.F.R. §820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes and resources for implementing quality management.  21 C.F.R. §820.3(v).

47.     Pursuant to 21 C.F.R. §820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

48.     Pursuant to 21 C.F.R. §820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

49.     Pursuant to 21 C.F.R. §820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

50.     Pursuant to 21 C.F.R. §820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate states of the device's design development.

51.     Pursuant to 21 C.F.R. §820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

52.     Pursuant to 21 C.F.R. §820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents.  Design validations shall ensure that devices conform to defined use needs and intended uses and shall include testing of production units under actual or simulated use conditions.

53.     Pursuant to 21 C.F.R. §820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

54.     Pursuant to 21 C.F.R. §820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

55.     Pursuant to 21 C.F.R. §820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications.  Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Such process controls shall include:

(a)     documented instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

(b)     monitoring and control of process parameters and component and device characteristics during production;

(c)     compliance with specified reference standards or codes;

(d)     the approval of processes and process equipment; and,

(e)     criteria for workmanship which shall be expressed in documented standard or by means of identified and approved representative samples.

56.     Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process or procedure.

57.     Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

58.     Pursuant to 21 C.F.R § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

59.     Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirements and is appropriately designed, constructed, placed and installed to facilitate maintenance, adjustment, cleaning and use.

60.     Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

61.     Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

62.     Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each

manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

63.     Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures.   "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

64.     Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met.   Each manufacturer shall ensure that validated processes are performed by qualified individuals.

65.     Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

66.     Pursuant to 21 C.F.R § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.   The procedures shall include requirements for:

      (a)     analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

      (b)     investigating the cause of nonconformities relating to product, processes and the quality system;

(c)     identify the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)     verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)     implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)     ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and,

(g)     submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

67.     Upon information and belief, the Profemur TL is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

68.     Upon information and belief, the Profemur TL is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

69.     Upon information and belief, the Profemur TL is adulterated pursuant to 21 U.S.C. § 351 because Wright failed to establish and maintain CGMP for its Profemur TL, including components, in accordance with 21 C.F.R. § 8202 *et seq.,* as set forth above.

70.    Upon information and belief, Microport failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for its Profemur TL, including its components.

71.    As a result of Microport's failure to establish and maintain CGMP as set forth above, the Profemur TL was defective and failed, resulting in injuries to Plaintiff Richard Hall.

72.    If Microport had complied with the federal requirements regarding CGMP, the Profemur TL would have been manufactured and/or designed properly such that it would not have resulted in injuries to Plaintiff Richard Hall.

73.    Plaintiff Richard Hall's injuries were both factually and proximately caused by the Defendant's defective Profemur TL.

74.    Plaintiff Richard Hall's injuries were both factually and proximately caused by the Defendant's unreasonably dangerous Profemur TL.

75.    Plaintiff Richard Hall further shows that he is entitled to recovery for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that he has incurred as a result of the defective product, the Revision Surgery, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## LIABILITY

### COUNT I -  NEGLIGENT DESIGN AND FAILURE TO WARN OR INSTRUCT

76.    Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through seventy-five (75) of this Complaint as if stated herein.

77.    Microport owed a duty of reasonable care to the general public, including Plaintiff Richard Hall, when it designed, manufactured, assembled, inspected, tested, marketed, placed into

the stream of commerce, and sold the Profemur TL, to protect users from an unreasonable risk of harm when using the Device for its intended purpose, in a reasonably foreseeable manner.

78.     Microport breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Profemur TL in a defective and unreasonably unsafe condition including, but not limited to, its foreseeably appreciated risk of harm from the Device's propensity for fretting, corrosion and failure.  A reasonably prudent medical device manufacturer would not have acted in this manner.

79.     Likewise, Microport owed Plaintiff a duty of reasonable care to discover the defects and to inform and/or warn him or his implanting surgeon of the defects once they were discovered, and Defendant failed to warn of the dangers inherent in the reasonably foreseeable use of the Profemur TL, further placing Plaintiff at risk for harm and injury.

80.     Mircoport failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, warning marketing, promotions and distribution of the Profemur TL.  Microport knew or should have known that these products cause significant bodily harm and were not safe for use by consumers, and/or through failure to comply with federal requirements.

81.     Microport, furthermore, in advertising, marketing, promoting, packaging and selling the Device negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Device was fit for its intended purpose when, in fact, it was not.

82.     Microport, in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Device had been adequately and reliably tested when, in fact, it had not.

83.     Microport, in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the risk of serious adverse events and/or effects from the Device was comparable to that of other hip replacement systems when, in fact, it was not.

84.     Microport in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding it safety, efficacy and fitness for human use by claiming the Device had not caused or contributed to serious adverse events and/or effects requiring the premature revision surgery to replace and/or repair the Device when, in fact, it had.

85.     Microport knew or had reason to know that Plaintiff Richard Hall, as a member of the general public for whose use the Device was placed into interstate commerce, would be likely to use the Device in a manner described in this Complaint.

86.     Microport knew or should have known of the dangers associated with the manner and circumstances of Plaintiff Richard Hall's foreseeable use of the Device, which dangers would not be obvious to the general public.

87.     Despite the fact that Microport knew or should have known that the Profemur TL posed a serious risk of bodily harm to consumers, Microport continued to manufacture and market the Device for use by consumers and/or continued to fail to comply with federal requirements.

88.     Microport knew or should have known that consumers such as Plaintiff Richard Hall would foreseeably suffer injury as a result of its failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

89.     Microport's conduct, as described above, including, but not limited to, its failure to adequately test and warn as well as its continued marketing and distribution of the Profemur TL

when it knew or should have known of the serious health risks these Devices created and/or the failure to comply with federal requirements, was and is negligent.

90.     As a direct and proximate result of Microport's negligence, including negligent testing, failure to warn and misrepresentations, Plaintiff Richard Hall suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

91.     As a direct and proximate result of Microport's negligence, Plaintiff Richard Hall has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

92.     Microport was negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

## COUNT II -   STRICT PRODUCTS LIABILITY:  DEFECTIVE DESIGN

93.     Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through ninety-two (92) of this Complaint as if stated herein.

94.     Plaintiff was damaged by the defective Profemur TL.

95.     Microport was engaged in the business of manufacturing, selling and distributing the Profemur TL.

96.     The Profemur TL used in Plaintiff Richard Hall's hip replacement surgery was supplied in a defective condition in its design, such that it would generate metal debris, metal ion cast off and corrosion at the articulating surface, rendering it unreasonably dangerous.

97.     Microport had a duty to place into the stream of commerce, manufacture, distribute, market, promote and sell the Profemur TL so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed and sold.

98.     Prior to January 12, 2016, Microport was engaged in the business of designing, manufacturing, marketing, distributing and selling orthopedic hip implants and did design, manufacture, distribute, market and sell the Device.

99.     Microport did in fact manufacture, sell, distribute, supply and/or promote the Device to Plaintiff Richard Hall and his implanting physician.  Microport expected the Device it was selling, distributing, supplying, manufacturing and/or promoting to reach, and which did in fact reach, implanting physicians and consumers in the State of Arkansas, including Plaintiff Richard Hall and his implanting physician, without substantial change in the condition.

100.    At the time the Device left the possession of Microport and the time the Device entered the stream of commerce, it was in an unreasonably dangerous or defective condition. These defects include, but are not limited to, the following:

    (a)     the Device was not reasonably safe as intended to be used;

    (b)     the Device had an inadequate design for the purpose of hip replacement;

    (c)     the Device contained unreasonably dangerous design defects, including an inherently unstable and defective design, to include the use of Cobalt and Chromium metal alloys (i.e., a CoCr modular Head) as the articulating surface, which resulted in an unreasonably high probability of early failure;

    (d)     the Device's unstable and defective design resulted in a hip prosthesis which had risks which exceeded the benefits of the medical device;

    (e)     the Device was not appropriately or adequately tested before its distribution; and,

    (f)     the Device had an unreasonably high propensity for metal debris and fretting corrosion under normal and expected use of the Device.

101.   At the time of Defendant's initial design, manufacture, marketing and sale of the Device, a safer, feasible, alternative safer design for the Device was known and available to Microport.

102.   At the time of and subsequent to Microport's initial design, manufacture, marketing and sale of the Device, including prior to the time of Plaintiff Richard Hall's Index Surgery, Microport had the ability to eliminate the unsafe character of the Device without impairing its usefulness.

103.   The Profemur TL Devices were, therefore, defective in design or formulation in that, when they left Microport's hands, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the Device's particular design or formulation, and/or it was more dangerous than an ordinary consumer would expect, and/or it failed to comply with federal requirements for these medical devices.

104.   The foreseeable risks associated with the design or formulation of the Profemur TL devices include, but are not limited to, the fact that the design or formulation of the Profemur TL Devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or it failed to comply with federal requirements.

105.   As a direct and proximate result of Plaintiff Richard Hall's use of the Profemur TL Device, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Microport and/or its failure to comply with federal requirements, Plaintiff Richard Hall has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

106.   As a direct and proximate result of Microport's defective product and tortious conduct as set forth herein, Plaintiff Richard Hall has suffered and will continue to suffer injuries,

damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

107.   The Profemur TL's defective condition proximately caused Plaintiff Richard Hall's damages.

## COUNT III - STRICT PRODUCTS LIABILITY:  MANUFACTURING DEFECT

108.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through one hundred seven (107), of this Complaint as if stated herein.

109.   Plaintiff Richard Hall was damaged by the defective Profemur TL.

110.   Microport was engaged in the business of manufacturing, selling and distributing the Profemur TL.

111.   The Profemur TL used in Plaintiff Richard Hall's hip replacement surgery was supplied in a defective condition in its manufacturer, such that it would generate metal debris, fretting and corrosion at the head cup interface, rendering it unreasonably dangerous.

112.   The Profemur TL's defective condition proximately caused Plaintiff's damages.

## COUNT IV - STRICT PRODUCTS LIABILITY:  FAILURE TO WARN

113.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through one hundred twelve (112) of this Complaint as if stated herein.

114.   Plaintiff Richard Hall was damaged by the defective Profemur TL.

115.   Microport was engaged in the business of manufacturing, selling and distributing the Profemur TL.

116.   At all times relevant herein, Microport was engaged in the design, development, testing, manufacturing, marketing and sale of the Profemur TL devices.

117.   Microport designed, manufactured, assembled and sold the Profemur TL devices to medical professionals and patients knowing that they would then be implanted in patients in need of hip prosthesis.

118.   Microport distributed and sold the Profemur TL devices in a condition such that when they left their place of manufacture, in their original form of manufacture, they included the defects described herein.

119.   The Profemur TL devices were expected to and did reach Plaintiff Richard Hall and his implanting surgeon, Dr. Day, without substantial change or adjustment in their condition as manufactured and sold by Microport.

120.   Defendant's Profemur TL devices designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Microport were in a dangerous and defective condition and posed a threat to any user or consumer of the Profemur TL.

121.   At all times relevant herein, Plaintiff Richard Hall was a person whom Microport should have considered to be subject to the harm caused by the defective nature of the Profemur TL.

122.   Microport's Devices were implanted and used in the manner for which they were intended.

123.   This use has resulted in severe physical and emotional and other injuries to Plaintiff Richard Hall.

124.   Microport knew or should have known through testing, adverse event reporting or otherwise that its Profemur TL devices created a high risk of bodily injury and serious harm.

125.   Microport had a duty to warn its sales representatives/distributors, implanting surgeons such as Dr. Day, and patients such as Plaintiff Richard Hall.  Microport breached its duty

in failing to provide adequate and timely warnings or instructions regarding its Profemur TL devices and their known defects.

126.     Microport, furthermore, breached its duty to warn at pre-surgery and/or post-surgery by (a) failing to adequately communicate the warning to Defendant's sales representatives/distributors and/or to the ultimate users, i.e., Plaintiff Richard Hall and/or his implanting physician; and/or (b) by failing to provide an adequate warning of the Device's potential risks.

127.     Adequate efforts to communicate a warning to the ultimate users were not made by Microport (or its sales representatives/distributors) and, to the extent a warning was communicated by Microport, the warning was inadequate.

128.     The warnings (pre-surgery and/or post-surgery) to Plaintiff Richard Hall and his implanting physician about the dangers the Device posed to consumers were inadequate. Examples of the lack and/or inadequacy of Microport's warnings include, but are not limited to, one of more of the following particulars:

(a)     the Device contained warnings insufficient to alert Plaintiff Richard Hall and Plaintiff's physicians as to the unreasonably high failure rate and propensity for generating metal wear debris, metal ion cast off and corrosion, associated with the Device, subjecting Plaintiff Richard Hall to risks which exceeded the benefits of the Device;

(b)     the Device contained misleading warnings emphasizing the efficacy of the Device while downplaying the risks associated with it, thereby making use of the Device more dangerous than the ordinary consumer would expect;

(c)     the Device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff Richard Hall through its prescribing physicians regarding

the risk, scope, propensity, frequency, duration and severity of the adverse events associated with the Device.

(d)    the Device's warnings and instructions did not disclose that it was inadequately tested;

(e)    the Device's warnings and instructions failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the Device; and,

(f)    the Device's instructions were insufficient to alert physicians and consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers.

129.   Plaintiff Richard Hall used the Device for its intended purpose, i.e., hip replacement.

130.   Plaintiff Richard Hall could not have discovered any defect in the Device through the exercise of due care.

131.   Microport, as designer, developer, manufacturer, marketer and distributor of medical devices is held to the level of knowledge of an expert in the field.

132.   Plaintiff Richard Hall and his implanting physician did not have substantially the same knowledge about the Device as Microport who was the designer, manufacturer, and distributor of the Device.

133.   Microport reasonably should have known if its Device was unsuited for active individuals such as Plaintiff Richard Hall.

134.   As a direct and proximate result of Microport's failure to adequately communicate a warning and/or failure to provide an adequate warning and other wrongful conduct as set forth

herein, Plaintiff Richard Hall has sustained and will continue to sustain serious physical injuries, severe emotional distress, mental anguish, economic losses and other damages, as set forth herein.

135.    As a direct result of Microport's failure to warn and/or inadequately warn and Defendant's other tortious conduct, Plaintiff Richard Hall has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

136.    As a direct and proximate result of Microport's failure to warn and/or inadequately warn and its other tortious conduct, as set forth herein, Plaintiff Richard Hall has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

**COUNT V -   <u>NEGLIGENT MISREPRESENTATION</u>**

137.    Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through one hundred thirty-six (136) of this Complaint as if stated herein.

138.    Microport had a duty to accurately and truthfully represent to the medical community, Plaintiff Richard Hall, and the public that the Profemur TL had not been adequately tested nor found to be safe and effective for the treatment of patients requiring a hip replacement. Instead, Microport made representations about the Device that it, at a minimum, should have known to be false.

139.    Microport negligently misrepresented to the medical community, implanting orthopedic surgeon Dr. Day, Plaintiff Richard Hall, and the public that the Profemur TL presented no risk or a low risk of unreasonable and dangerous adverse side effects.

140.    Had Microport accurately and truthfully represented to the medical community, Dr. Day, Plaintiff, Richard Hall, and the public the material facts that it knew or should have known

regarding the risks of the Profemur TL, Plaintiff and/or Plaintiff Richard Hall's healthcare provider(s) would not have utilized the Profemur TL.

141.    As a direct and proximate result of Microport's negligent misrepresentations, Plaintiff Richard Hall has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

**COUNT V -** **PUNITIVE DAMAGES**

142.    Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs one (1) through one hundred forty-one (141) of this Complaint as if stated herein.

143.    Microport knew or should have known, in light of the surrounding circumstances that its conduct would naturally and probably result in injury or damage and continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Accordingly, Plaintiff is entitled to an award of punitive damages.

## JURY DEMAND

144.    The Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and an award of damages against Microport Orthopedics, Inc., as follows:

(a)    For special damages, to include past and future medical and incidental expenses, according to proof;

(b)    For past and future general damages, to include pain and suffering, emotional distress and mental anguish, according to proof;

(c)    For exemplary and punitive damages in an amount to be determined at trial;

(d)    For pre-judgment and post-judgment interest;

(e)     For the costs of this action, including reasonable attorneys' fees;

(f)     Granting any and all such other and further legal and equitable relief as the Court
        deems necessary, just and proper;

(g)     For an amount exceeding that required for federal court jurisdiction in diversity of
        citizenship cases; and

(h)     For a jury trial.

Dated: January 10, 2020

                                        Respectfully submitted,


                                        Keith L. Grayson
                                        Arkansas Bar No. 91014
                                        **GRAYSON & GRAYSON, P.A.**
                                        209 E. Main Street
                                        PO Box 1447
                                        Heber Springs, AR 72543
                                        Direct: 501.206.0905
                                        graysonandgrayson@att.net